# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JOEL C. WIENEKE**
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF M.S. | ) | |
| (A Child Alleged in Need of Services), | ) | |
| | ) | **FILED** |
| And | ) | |
| | ) | |
| K.S., (Mother) | ) | |
| | ) | CLERK |
| Appellant-Respondent, | ) | of the supreme court, court of appeals and tax court |
| | ) | |
| vs. | ) | No. 67A04-1305-JC-212 |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE PUTNAM CIRCUIT COURT
The Honorable Matthew L. Headley, Judge
Cause No. 67C01-1302-JC-14

**December 27, 2013**

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

Case Summary and Issues

K.S. ("Mother") appeals the trial court's dismissal of the Child in Need of Services ("CHINS") case regarding her son M.S. Mother raises two issues for our review: (1) whether the trial court's out-of-state placement of M.S. with his father ("Father") was error; and (2) whether the Indiana Department of Child Services' ("DCS") request for dismissal of the CHINS proceedings violated Indiana Code section 31-34-21-5.5 by failing to make reasonable efforts to preserve a family. Concluding the trial court's placement of M.S. was not error and that Indiana Code section 31-34-21-5.5 was not violated, we affirm.

Facts and Procedural History

On February 4, 2013, DCS received a report that Mother was abusing drugs inside the home and leaving her five children with their sick grandmother while she went out seeking drugs.[1] Two days later, on February 6th, a DCS case manager visited Mother's home and requested that Mother submit to a random drug screen. Mother submitted to the drug test and admitted to the DCS officer that she would likely "test positive for Vicodin, marijuana and morphine." Transcript at 4. The case manager spoke with the children, but Mother would not allow them to leave earshot, and it was apparent to the case manager that the children had been coached or were afraid to speak.

On February 8th, DCS again visited the home and learned that Mother had been

---

[1] There were five children involved in the CHINS proceedings; however, this appeal only concerns the placement of M.S.

missing since DCS's prior visit. DCS was able to speak with the children, who confirmed they had not seen Mother for a few days. The children revealed several facts which were of concern to DCS, including: Mother had given one of the children a black eye the previous year; one of the children, who was two years old, was kept strapped into a car-seat constantly throughout the day and slept in the car-seat at night; the children's grandmother or low-functioning aunt are often left to take care of the children; grandmother takes a lot of medicine and often falls asleep while watching the children; and grandmother hits the children on the arms and legs with a wooden back-scratcher. DCS also observed that the children exhibited a foul odor, as if they had not bathed for a while. The children were removed from the home that afternoon.

DCS filed a CHINS petition on February 12th, alleging Mother was dependent on drugs, that she was unable to care for her children, and that proper caregivers had not been provided for the children. A detention and initial hearing was held on the same day, but Mother failed to appear because DCS was unable to contact her or determine her whereabouts. DCS was also in the process of locating M.S.'s father, who was in the military and stationed in the State of Washington. Mother's drug test results came back positive for methamphetamine, amphetamine, cocaine, BZE, hydromorphone, and morphine. M.S. remained in foster care following the hearing.

On February 28, 2013, the trial court held an admission hearing at which both Mother and Father were present. Mother admitted to the allegations in the CHINS petition and that M.S. was a CHINS. The trial court then questioned Father regarding his willingness and ability to take care of M.S. Father indicated that he was willing and able

to care for M.S.; he rented an apartment and lived by himself; and he would be honorably discharged from the military in three months and indicated that he planned to find employment in the private sector. Mother stated that she would rather see M.S. placed with Father than with a foster family but expressed concern about the long-distance situation the placement would create.

On March 4, 2013, the trial court issued a written Order on Initial/Detention and Custody Hearing, which provided for the placement of M.S. with Father over the objection of DCS. Specifically, the trial court found:

> The placement is an emergency required to protect the health and welfare of the children for the following reasons: [M.S.] is currently in a foster home which is more restrictive than necessary. [Father] is fit, willing and able to care for him and it is in [M.S.'s] best interest to be in the care and custody of his father.

Appellant's Appendix at 15. The trial court also ordered an inspection of Father's home to determine the safety and fitness of the home for the purpose of housing a child, which was to be completed by March 21, 2013.

A dispositional hearing was held on March 21, 2013. At that time, DCS had not yet arranged an inspection of Father's home in Washington. Mother's attorney said that Mother was living a "transient existence," tr. at 91; Mother had no permanent residence, vehicle, or phone at the time. Because of those circumstances and Mother's drug-related issues, it was pointed out that administration of DCS services for Mother would be hindered and that there may be difficulties with arranging supervised visitation.

Father informed the court that his term in the military would be over at the end of May and that he planned to move to San Diego, California at that time. While Father was

4

at work, his mother (M.S.'s paternal grandmother), who had gone up to Washington from her home in San Diego, had been watching M.S. The parties also discussed custody of M.S. at the dispositional hearing. Father had obtained a default divorce from Mother in 2009 from a court in San Diego County, California. However, that court declined jurisdiction over M.S., and thus, no custody determination had ever been made with respect to M.S.[2]

DCS arranged for an inspection of Father's home to be conducted by the Community and Family Services Foundation ("CFSF") of Port Orchard, Washington. The inspection was done on April 17, 2013. The inspector found no substantial safety concerns[3] and reported that "[M.S.] was a very happy and well adjusted boy." Appellant's App. at 28. The report also noted that "[M.S.] was emphatic that he wants to live with his father." Id. at 29.

On April 23, 2013, DCS filed a motion to dismiss the CHINS proceedings as to M.S., stating there was no good cause why the trial court should continue jurisdiction in the matter; DCS attached the CFSF report as an exhibit to its motion to dismiss. The trial court granted the DCS motion on April 24, 2013. This appeal followed.

---

[2] DCS contends that both Father and Mother maintained custody over M.S., since no custody order had been made prior to this case. At the dispositional hearing, Father's attorney stated an intent to file a motion seeking a court order officially granting custody of M.S. to Father, and the trial court indicated a willingness to assume jurisdiction for the purpose of making a custody determination. However, the record does not indicate whether such a motion was ever filed.

[3] The CFSF report indicated that CFSF's only concern was that M.S. did not have his own bed, which would reportedly be remedied when Father moved to San Diego at the end of the following month.

## Discussion and Decision

### I. Out-of-State Placement of M.S. with Father

Mother contends that the trial court erred by placing M.S. with Father, who lives in the State of Washington, after M.S. was adjudicated a CHINS. Mother points to Indiana Code section 31-34-20-1, which regulates the out-of-state placement of a child in CHINS proceedings. The pertinent portion of that statute provides:

> (b) A juvenile court may not place a child in a home or facility that is located outside Indiana unless:
> > (1) the placement is recommended or approved by the director of the department or the director's designee; or
> > (2) the juvenile court makes written findings based on clear and convincing evidence that:
> > > (A) the out-of-state placement is appropriate because there is not a comparable facility with adequate services located in Indiana; or
> > > (B) the location of the home or facility is within a distance not greater than fifty (50) miles from the county of residence of the child.

Ind. Code § 31-34-20-1(b). Mother argues that the trial court's placement of M.S. violates the statute and is not supported by the evidence. Conversely, DCS contends that the child's placement with Father was not error.[4]

Importantly, M.S.'s placement was not recommended or approved by the director

---

[4] Mother argues on reply that DCS should be estopped from arguing in favor of M.S.'s out-of-state placement with Father because DCS objected to the placement at the hearing on February 28, 2013. "[J]udicial estoppel prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted. . . . The purpose of judicial estoppel is to protect litigants from allegedly improper conduct by their adversaries." Am. Family Mut. Ins. Co. v. Ginther, 803 N.E.2d 224, 234-35 (Ind. Ct. App. 2004), trans. denied. While DCS did initially object to the placement, DCS effectively recanted its objection during the dispositional hearing on March 21 and by seeking dismissal of the CHINS proceedings. Therefore, judicial estoppel is not applicable here. Moreover, the goal of DCS is to protect children and serve the best interest of a child; its position in certain proceedings can be expected to change as circumstances change or information is developed. The public interest is unlikely to be served by prohibiting DCS from changing its position throughout the course of CHINS proceedings.

of DCS, and the location of Father's home was more than fifty miles from M.S.'s previous residence. Thus, the trial court must have found "based on clear and convincing evidence that . . . the out-of-state placement is appropriate because there is not a comparable facility with adequate services located in Indiana . . . ." Id.

When reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence meets that burden. A.J.L. v. D.A.L., 912 N.E.2d 866, 870 (Ind. Ct. App. 2009). Rather, we ask whether a reasonable trier of fact could conclude that the evidence supports the judgment, considering only the probative evidence and reasonable inferences that support the judgment. Id. We will neither reweigh evidence nor judge witness credibility. Id.

We begin by recognizing that M.S. was not placed in an out-of-state facility arbitrarily chosen by the trial court. Rather, M.S. was placed with his natural father. Indeed, "Indiana law has long recognized that 'natural parents are entitled to the custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control, and education.'" In re Guardianship of B.H., 770 N.E.2d 283, 285 (Ind. 2002) (quoting Gilmore v. Kitson, 165 Ind. 402, 406, 74 N.E. 1083, 1084 (1905)). We believe this presumption in favor of natural parents lends strong support to the trial court's decision to place M.S. with Father.

At the outset, the trial court's decision looks very different when the proposed out-of-state placement is with a natural parent. The court's inquiry is whether "out-of-state placement is appropriate because there is not a comparable facility with adequate services located in Indiana." Ind. Code § 31-34-20-1(b)(2)(A). Placement of a child with his

7

natural parent is a unique situation, and no facility—inside or outside of Indiana—is equal to it. Here, M.S.'s previous living situation was with a foster family, and Father was willing and able to take custody of M.S. At the time of the placement, Father had a steady job as a military serviceman and intended to seek employment in the private sector upon his discharge, at which time he intended to move to San Diego, California, near M.S.'s paternal grandmother. An inspection of Father's home in Washington revealed that the home "met all safety requirements" and that "[M.S.] was a very happy and well adjusted boy." Appellant's App. at 28. The inspection report also noted that M.S. wished to continue living with Father.

Mother's argument on appeal points out that Father had not seen M.S. in four years and that the trial court had no independent knowledge of the condition of Father's home at the time of placement. Indeed, an inspection of the home was not conducted until after M.S. began living with Father in Washington. We believe more in-depth questioning of Father and a home inspection prior to placement would have certainly been prudent. A more cautious approach would be preferable when placing a child out-of-state in this scenario. Although, here, the end result was to the child's benefit, it is not difficult to imagine how this story could have had a not-so-happy ending.

We believe that the evidence in this case supported the continued out-of-state placement with M.S.'s natural father, which the trial court found to be in the child's best interest. Therefore, the trial court's decision to place M.S. with Father and eventually dismiss the CHINS proceedings was not error.

8

## II. Preservation of Families

Mother also argues on appeal that DCS neglected its duty under Indiana Code section 31-34-21-5.5 to make "reasonable efforts to reunify or preserve a family." In seeking that end, "the child's health and safety are of paramount concern." Ind. Code § 31-34-21-5.5(a).

DCS maintains that its reunification efforts were reasonable in this case, pointing out that Mother was ill-equipped to care for M.S. and that the primary concerns for M.S.'s health and safety were satisfied through continued placement with Father. We agree. The health and safety of M.S. was served by his placement with Father, as evidenced by the CFSF report stating the same. Moreover, the placement of M.S. with Father was a familial reunification of sorts, albeit not of the kind Mother would have preferred. In light of the circumstances, we believe DCS's reunification efforts were reasonable.

## Conclusion

Concluding the trial court's placement of M.S. with Father was not error and that DCS did not violate Indiana Code section 31-34-21-5.5, we affirm.

Affirmed.

BARNES, J., concurs.

BROWN, J., concurs with separate opinion.

9

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF M.S.                      )
(A Child Alleged in Need of Services),     )
                                            )
        And                                )
                                            )
K.S., (Mother)                             )
                                            )
        Appellant-Respondent,              )
                                            )
            vs.                            )      No. 67A04-1305-JC-212
                                            )
THE INDIANA DEPARTMENT OF                  )
CHILD SERVICES,                            )
                                            )
        Appellee-Petitioner.               )

**BROWN, Judge, concurring**

The majority observes that the court did not have independent knowledge of the condition of Father's home at the time of M.S.'s placement, noting that the inspection was not conducted until after M.S. began living with Father in Washington, and states that "[a] more cautious approach would be preferable when placing a child out-of-state in this scenario." Slip op. at 8. Although I concur with the majority, I write separately to note that not only do I agree it would have been prudent to perform the home inspection prior to placing M.S., but I am also concerned about the subsequent lack of supervision provided by the trial court prior to dismissing the CHINS proceedings. M.S. was placed with Father on March 4, 2013 at the initial detention hearing and allowed to go with Father to Washington. On April 4, 2013, the court entered a dispositional decree

10

regarding Father which ordered him to perform a number of actions including contacting the family case manager weekly, notifying the family case manager of any household or employment changes and any arrest of any household member, enrolling in programs if recommended by the family case manager, keeping all appointments with any service providers, signing any releases necessary for the family case manager to monitor compliance with the terms of the court's order, maintaining suitable, safe, and stable housing, refraining from consuming or selling any controlled substances, obeying the law, submitting to random drug/alcohol screens, meeting all the medical and mental health needs of M.S. in a timely and complete manner, providing M.S. with a safe, secure, and nurturing environment and being an effective caregiver with the necessary skills, knowledge, and abilities to provide M.S. with this type of environment on a long term basis, ensuring that M.S. will become engaged in a home-based counseling program, and seeing that M.S. is properly fed, supervised, and enrolled in and attending school. The decree awarded DCS wardship of M.S. with the responsibility for supervision, care, and placement. The decree also scheduled a periodic case review hearing for June 27, 2013. On April 17, 2013, the CFSF in Washington conducted an inspection of Father's home, and on April 23, 2013, less than a week after the inspection, DCS filed its motion to dismiss the CHINS proceedings. The court granted the motion the next day.

Ind. Code § 31-34-21-11 provides that "[w]hen the juvenile court finds that the objectives of the dispositional decree have been met, the court shall discharge the child and the child's parent, guardian, or custodian." Clearly the statute contemplates achievement of the requirements of the dispositional decree. Here, in the short span of

11

nineteen days between the entry of the decree and the filing of the motion to dismiss by DCS, there was no time to have the scheduled case review hearing and no showing whatsoever of Father's compliance with any of the terms of the decree.

Ind. Trial Rule 41(A)(2) allows for voluntary dismissals by order of the court and provides in part that "[e]xcept as provided in subsection (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court *and upon such terms and conditions as the court deems proper*." (Emphasis added).

Mother testified at the February 28, 2013 hearing that she was "floored" to see and speak to Father because she had not "seen him in almost four and a half years," he "has been an absent . . . parent," and he was "a stranger" to M.S. Transcript at 65. Father did not dispute this. Father also indicated that although he had another child who was eight years old at the time of the hearing, he had not seen that child in about seven years. Further, Father indicated to the CFSF at the inspection of his Washington apartment that he was intending to move to San Diego "soon" and would be establishing a new residence there. Appellant's Appendix at 28. Under such circumstances, despite the motion by DCS to dismiss the CHINS petition, I believe that M.S. would have been better served had the court denied the motion and ordered that DCS continue with services for a period of time to monitor Father's parenting and compliance with the terms of the decree.